# UNITED STATES DISTRICT COURT
# FOR THE DISTRICT OF SOUTH CAROLINA

| | |
|---|---|
| KENNETH EVANS, Individually and on behalf of all others similarly situated,<br><br>Plaintiff,<br><br>v.<br><br>SCANA CORPORATION, KEVIN B. MARSH, and JIMMY E. ADDISON,<br><br>Defendants. | Case No. 3:17-2683-MBS<br><br>**CLASS ACTION COMPLAINT FOR VIOLATION OF THE FEDERAL SECURITIES LAWS**<br><br>**JURY TRIAL DEMANDED** |

Plaintiff Kenneth Evans ("Plaintiff"), individually and on behalf of all other persons similarly situated, by Plaintiff's undersigned attorneys, for Plaintiff's complaint against Defendants (defined below), alleges the following based upon personal knowledge as to Plaintiff and Plaintiff's own acts, and information and belief as to all other matters, based upon, *inter alia*, the investigation conducted by and through Plaintiff's attorneys, which included, among other things, a review of the Defendants' public documents, conference calls and announcements made by Defendants, United States Securities and Exchange Commission ("SEC") filings, wire and press releases published by and regarding SCANA Corporation ("SCANA" or the "Company"), analysts' reports and advisories about the Company, and information readily obtainable on the Internet. Plaintiff believes that substantial evidentiary support will exist for the allegations set forth herein after a reasonable opportunity for discovery.

## NATURE OF THE ACTION

1. This is a federal securities class action on behalf of a class consisting of all persons and entities other than Defendants who purchased or otherwise acquired the publicly traded securities of SCANA from February 26, 2016 through September 4, 2017, both dates

1

inclusive (the "Class Period"). Plaintiff seeks to recover compensable damages caused by Defendants' violations of the federal securities laws and to pursue remedies under Sections 10(b) and 20(a) of the Securities Exchange Act of 1934 (the "Exchange Act") and Rule 10b-5 promulgated thereunder.

## JURISDICTION AND VENUE

2.  The claims asserted herein arise under and pursuant to §§10(b) and 20(a) of the Exchange Act (15 U.S.C. §§78j(b) and §78t(a)) and Rule 10b-5 promulgated thereunder by the SEC (17 C.F.R. §240.10b-5).

3.  This Court has jurisdiction over the subject matter of this action under 28 U.S.C. §1331 and §27 of the Exchange Act.

4.  Venue is proper in this judicial district pursuant to §27 of the Exchange Act (15 U.S.C. §78aa) and 28 U.S.C. §1391(b) as a significant portion of Defendants' actions and subsequent damages took place within this judicial district.

5.  In connection with the acts, conduct and other wrongs alleged in this Complaint, Defendants, directly or indirectly, used the means and instrumentalities of interstate commerce, including but not limited to, the United States mail, interstate telephone communications and the facilities of the national securities exchange.

## PARTIES

6.  Plaintiff, as set forth in the accompanying Certification, purchased the Company's securities at artificially inflated prices during the Class Period and was damaged upon the revelation of the alleged corrective disclosure.

7.  Defendant SCANA, through its subsidiaries, engages in the generation, transmission, distribution, and sale of electricity to retail and wholesale customers in South Carolina. The Company is incorporated in South Carolina and its principal executive offices are

located at 100 SCANA Parkway, Cayce, South Carolina. The Company's securities are traded on the New York Stock Exchange ("NYSE") under the ticker symbol "SCG."

8. Defendant Kevin B. Marsh ("Marsh") has been the Company's Chairman of the Board, President, Chief Executive Officer and Chief Operating Officer throughout the Class Period.

9. Defendant Jimmy E. Addison ("Addison") has been the Company's Executive Vice President and Chief Financial Officer throughout the Class Period.

10. Defendants Marsh and Addison are sometimes referred to herein as the "Individual Defendants."

11. Each of the Individual Defendants:

(a) directly participated in the management of the Company;

(b) was directly involved in the day-to-day operations of the Company at the highest levels;

(c) was privy to confidential proprietary information concerning the Company and its business and operations;

(d) was directly or indirectly involved in drafting, producing, reviewing and/or disseminating the false and misleading statements and information alleged herein;

(e) was directly or indirectly involved in the oversight or implementation of the Company's internal controls;

(f) was aware of or recklessly disregarded the fact that the false and misleading statements were being issued concerning the Company; and/or

(g) approved or ratified these statements in violation of the federal securities laws.

12.     The Company is liable for the acts of the Individual Defendants and its employees under the doctrine of *respondeat superior* and common law principles of agency because all of the wrongful acts complained of herein were carried out within the scope of their employment.

13.     The scienter of the Individual Defendants and other employees and agents of the Company is similarly imputed to the Company under *respondeat superior* and agency principles.

14.     The Company and the Individual Defendants are referred to herein, collectively, as the "Defendants."

## SUBSTANTIVE ALLEGATIONS

15.     In 2008, SCANA's subsidiary South Carolina Electric & Gas Co. ("SCE&G") and Santee Cooper, a state-owned utility in South Carolina, began the process of licensing and building two 1,117-megawatt nuclear electric-generating units at V.C. Summer Nuclear Station in Fairfield County, SCE&G and Santee Cooper commissioned Westinghouse Electric Co. to build the two nuclear plants.

16.     On February 26, 2016, the Company filed a Form 10-K for the fiscal year ended December 31, 2015 (the "2015 10-K") with the SEC, which provided the Company's annual financial results and position. The 2015 10-K was signed by Defendants Marsh and Addison. The 2015 10-K also contained signed certifications pursuant to the Sarbanes-Oxley Act of 2002 ("SOX") by Defendants Marsh and Addison attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

17.     The 2015 10-K stated the following regarding the V.C. Summer Nuclear Station construction project:

New Nuclear Construction

SCE&G, on behalf of itself and as agent for Santee Cooper, has contracted with the Consortium for the design and construction of two 1,250 MW (1,117 MW, net) nuclear generation units, which SCE&G will jointly own with Santee Cooper. SCE&G's current ownership share in the New Units is 55%, and SCE&G has agreed to acquire an additional 5% ownership from Santee Cooper in increments beginning with the commercial operation date of Unit 2. The purchase of this additional 5% ownership is expected to be funded by increased cash flows resulting from tax deductibility of depreciation associated with the New Units when they enter commercial operation.

The construction of the New Units and SCE&G's related recovery of financing costs through rates is subject to review and approval by the SCPSC as provided for in the BLRA. As of December 31, 2015, SCE&G's investment in the New Units totaled $3.6 billion, for which the financing costs on $3.2 billion have been reflected in rates under the BLRA.

In September 2015, the SCPSC approved an updated BLRA milestone schedule and certain updated owner's costs and other capital costs, some of which were associated with schedule delays and other contested costs. Also in September 2015, the SCPSC approved a revision to the allowed return on equity for new nuclear construction from 11.0% to 10.5%, to be applied prospectively for the purpose of calculating revised rates sought by SCE&G under the BLRA on and after January 1, 2016.

On October 27, 2015, SCE&G, Santee Cooper and the Consortium reached a settlement regarding certain disputes, and the EPC Contract was amended. The October 2015 Amendment became effective on December 31, 2015, and among other things, it resolved by settlement and release substantially all outstanding disputes between SCE&G and the Consortium. The October 2015 Amendment also provides SCE&G and Santee Cooper an irrevocable option, until November 1, 2016 and subject to regulatory approvals, to further amend the EPC Contract to fix the total amount to be paid to the Consortium for its entire scope of work on the project after June 30, 2015, subject to certain exceptions.

On November 19, 2015, SCE&G held an allowable ex parte communication briefing with the SCPSC to describe SCE&G's settlement with the Consortium. During that briefing, the Company provided the following summary of key points related to the SCPSC's September 2015 order and the October 2015 Amendment.

| | SCPSC Order #2015-661 September 2015 | October 2015 Amendment | Fixed Price Option Under the October 2015 Amendment |
|---|---|---|---|
| Guaranteed Substantial Completion Dates | Unit 2 - June 2019 Unit 3 - June 2020 | | Unit 2 - August 2019 Unit 3 - August 2020 |
| Capital Cost (SCE&G's 55% share) | $5.247 billion | $5.492 billion | $6.757 billion |
| Future Escalation to WEC* | $794 million | $813 million | $19 million |
| Total Expected Project Cost (SCE&G's 55% share) | $6.827 billion | $7.113 billion | $7.601 billion |
| Liquidated Damages | $155 million at 100% $86 million - SCE&G | $926 million at 100% $509 million - SCE&G | $676 million at 100% $372 million - SCE&G |
| Bonuses | Capacity Performance Related | Completion - Capacity Performance bonus removed $550 million at 100% $303 million - SCE&G | $300 million at 100% $165 million - SCE&G |
| Change in Law Language | Generally defined | Explicitly defined - Formal written adoption of a new statute, regulation, requirement, or code or new NRC regulatory requirement that did not exist as of this amendment | |

\* The fixed price option, regardless of date of acceptance, would fix project costs and shift the risk of escalation (excluding escalation primarily on owner's and transmission costs) to WEC as of June 30, 2015. Total gross escalation recorded as of June 30, 2015 is $386 million. Under the fixed price option, total gross escalation remaining on the project is estimated to be approximately $145 million.

Following an evaluation as to whether to exercise the fixed price option, SCE&G expects to file a petition, as provided under the BLRA, for an update to the project's estimated capital cost schedule which would incorporate the impact of the October 2015 Amendment. Refer to the Exhibit Index for information on where a copy of the October 2015 Amendment is available publicly.

The information summarized above, as well as additional information on these and other related matters, is further discussed at Note 2 and Note 10 to the consolidated financial statements.

18.     On February 24, 2017, the Company filed a Form 10-K for the fiscal year ended December 31, 2016 (the "2016 10-K") with the SEC, which provided the Company's annual financial results and position. The 2016 10-K was signed by Defendants Marsh and Addison. The 2016 10-K also contained signed SOX certifications by Defendants Marsh and Addison attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

19.     The 2016 10-K stated the following regarding the V.C. Summer Nuclear Station construction project:

6

New Nuclear Construction

SCE&G, on behalf of itself and as agent for Santee Cooper, has contracted with the Consortium for the design and construction of two 1,250 MW (1,117 MW, net) nuclear generation units, which SCE&G will jointly own with Santee Cooper. SCE&G's current ownership share in the New Units is 55%, and SCE&G has agreed to acquire an additional 5% ownership from Santee Cooper in increments beginning with the commercial operation date of Unit 2.

On October 27, 2015, SCE&G, Santee Cooper and the Consortium reached a settlement regarding certain disputes, and the EPC Contract was amended. The October 2015 Amendment became effective on December 31, 2015, and among other things, it resolved by settlement and release substantially all then-outstanding disputes between SCE&G and the Consortium. The October 2015 Amendment also provided SCE&G and Santee Cooper an option, subject to regulatory approvals, to fix the

total amount to be paid to the Consortium for its entire scope of work on the project after June 30, 2015, subject to certain exceptions. In May 2016, SCE&G petitioned the SCPSC for approval of updated construction and capital cost schedules for the New Units developed as a result of the October 2015 Amendment. On November 9, 2016, the SCPSC approved a settlement agreement among SCE&G, ORS and certain other parties concerning this petition. The SCPSC also approved SCE&G's election of the fixed price option.

The approved construction schedule designates contractual guaranteed substantial completion dates of August 31, 2019 and August 31, 2020 for Units 2 and 3, respectively, although recent communications from WEC indicate substantial completion dates of April 2020 and December 2020 for Units 2 and 3, respectively. These later dates remain within SCPSC-approved 18-month contingency periods provided for under the BLRA, and achievement of such dates would also allow the output of both units to qualify, under current law, for federal production tax credits. However, there is substantial uncertainty as to WEC's ability to meet these dates given its historical inability to meet forecasted productivity and work force efficiency levels.

The approved capital cost schedule includes incremental capital costs. SCE&G's total project capital cost is now estimated at approximately $6.8 billion including owner's costs and transmission, or $7.7 billion with escalation and AFC. In addition, the SCPSC approved revising SCE&G's allowed ROE for new nuclear construction from 10.5% to 10.25%. This revised ROE will be applied prospectively for the purpose of calculating revised rates sought by SCE&G under the BLRA on and after January 1, 2017. In addition, SCE&G may not file future requests to amend capital cost schedules prior to January 28, 2019, unless its annual revised rate request is denied because SCE&G is out of compliance with its approved capital cost schedule or BLRA construction milestone schedule. In

most circumstances, if the projected commercial operation date for Unit 2 is extended, the expiration of the January 28, 2019 moratorium will be extended by an equal amount of time.

SCE&G and Santee Cooper, the co-owner of the New Units, continue to evaluate various actions which might be taken in the event that Toshiba and WEC are unable or unwilling to complete the project. These include completing the work under any of several arrangements with other contractors or, were it determined to be prudent, halting the project, leaving SCE&G to pursue cost recovery under the abandonment provisions of the BLRA. Any significant delay in the timing of construction or any determination by the SCPSC to disallow the recovery of costs would adversely impact results of operations, cash flows and financial condition.

The information summarized above, as well as additional information regarding uncertainties concerning WEC's ability to continue to fulfill its performance and financial commitments and Toshiba's ability to perform under its payment guaranty with respect to the project and other related matters, is further discussed in Note 2 and Note 10 to the consolidated financial statements.

20.     On May 5, 2017, the Company filed a Form 10-Q for the quarterly period ended March 31, 2017 (the "2017 Q1 10-Q") with the SEC, which provided the Company's annual financial results and position. The 2017 Q1 10-Q contained signed SOX certifications by Defendants Marsh and Addison attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

21.     The 2017 Q1 10-Q stated the following regarding the V.C. Summer Nuclear Station construction project:

New Nuclear Construction

SCE&G, on behalf of itself and as agent for Santee Cooper, entered into the EPC Contract with the Consortium in 2008 for the design and construction of the New Units. SCE&G's ownership share in the New Units is 55%. As discussed below, various difficulties have been encountered in connection with the project. The ability of the construction team to adhere to established budgets and construction schedules has been affected by many variables, including unanticipated difficulties encountered in connection with project engineering and the construction of project components, constrained financial resources of the contractors, regulatory, legal, training and construction processes associated with

8

securing approvals, permits and licenses and necessary amendments to them within projected timeframes, the availability of labor and materials at estimated costs, the efficiency of project labor and weather. There have also been contractor and supplier performance issues, difficulties in timely meeting critical regulatory requirements, contract disputes, and changes in key contractors or subcontractors. No assurance can be given that these and other construction-related difficulties will not continue to be experienced as construction progresses.

22. The statements referenced in ¶¶ 16-21 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's primary contractor for the V.C. Summer Nuclear Station construction project, Westinghouse, lacked a legitimate construction schedule; (2) Westinghouse's reactor design was often not constructible; (3) Westinghouse lacked the organization needed to complete the V.C. Summer Nuclear Station construction project; and (4) as a result, the Company's public statements were materially false and misleading at all relevant times.

23. On July 27, 2017, the Company revealed during aftermarket hours that the cost of completing the V.C. Summer Nuclear Station construction project would far exceed Westinghouse's estimates, stating in part:

> **South Carolina Electric & Gas Company And Santee Cooper Agree To Amount Of Guaranty Payments From Toshiba**
>
> Cayce, SC, July 27, 2017… South Carolina Electric & Gas Company (SCE&G), principal subsidiary of SCANA Corporation (SCANA) (NYSE:SCG), and Santee Cooper, have entered into a definitive agreement with Toshiba Corporation (Toshiba) for Toshiba to pay $2.168 billion ($1.192 billion to SCE&G for its 55% and $0.976 billion to Santee Cooper for its 45% project ownership) in full satisfaction of its guaranty of obligations of Westinghouse Electric Company, LLC (WEC) under the engineering, procurement, and construction contract (the EPC Contract) for the two new nuclear units at the V.C. Summer Nuclear Station in Jenkinsville, SC.

9

In the agreement, Toshiba commits to make payments in a series of installments over a period beginning in October 2017 and ending in September 2022. Certain of these payments may be satisfied by distributions through the bankruptcy court process from WEC to SCE&G and Santee Cooper. These payments (which are subject to reduction if WEC pays creditors holding liens on project assets) are payable regardless of whether both or either of the two nuclear units are completed, or the project is abandoned. If the units are completed and upon completion actual construction costs, net of payment from Toshiba, are less than the specified maximum amount payable under the EPC Contract, Toshiba will have the right to receive part of the difference.

The project owners are continuing their efforts to determine the most prudent path forward for the nuclear project. ***However, the project owners anticipate that the additional cost to complete both units beyond the amounts payable in connection with the EPC Contract will materially exceed prior WEC estimates as well as the anticipated guaranty settlement payments from Toshiba.*** Additionally, the units would need to be online before January 1, 2021 to qualify for production tax credits, under current tax rules. At this point, the project owners believe that the units could not be brought online until after this date. The project owners are considering these factors, as well as their future generation needs, in their evaluation of the project. Based on these considerations, the alternatives of completing both units or one unit are subject to significant challenges. The owners expect to announce their decisions soon.

(Emphasis added).

24. On this news, shares of the Company fell $4.35 per share or over 6% from its previous closing price to close at $61.29 per share on July 28, 2017, damaging investors.

25. On July 31, 2017, the Company announced that it will cease construction of the two new nuclear units at the V.C. Summer Nuclear Station site.

26. On August 8, 2017, the Company filed a Form 10-Q for the quarterly period ended June 30, 2017 (the "2017 Q2 10-Q") with the SEC, which provided the Company's annual financial results and position. The 2017 Q2 10-Q contained signed SOX certifications by Defendants Marsh and Addison attesting to the accuracy of financial reporting, the disclosure of any material changes to the Company's internal controls over financial reporting, and the disclosure of all fraud.

27. The 2017 Q2 10-Q stated the following regarding the V.C. Summer Nuclear Station construction project:

New Nuclear Construction

SCE&G, on behalf of itself and as agent for Santee Cooper, entered into the EPC Contract with the Consortium in 2008 for the design and construction of the New Units. SCE&G's ownership share in the New Units is 55%. As discussed below, various difficulties have been encountered in connection with the project. The ability to adhere to established budgets and construction schedules was affected by many variables, including unanticipated difficulties encountered in connection with project engineering and the construction of project components, constrained financial resources of the contractors, regulatory, legal, training and construction processes associated with securing approvals, permits and licenses and necessary amendmentsto them within projected timeframes, the availability of labor and materials at estimated costs, the efficiency of project labor and weather. There were also contractor and supplier performance issues, difficulties in timely meeting critical regulatory requirements, contract disputes, and changes in key contractors or subcontractors. These matters, and others as more fully discussed below, have resulted in the Company's determination on July 31, 2017, after a comprehensive analysis, to abandon the construction of the New Units and to seek recovery under the abandonment provisions of the BLRA of costs expended on them.

28. The statements referenced in ¶¶ 26-27 above were materially false and/or misleading because they misrepresented and failed to disclose the following adverse facts pertaining to the Company's business, operational and financial results, which were known to Defendants or recklessly disregarded by them. Specifically, Defendants made false and/or misleading statements and/or failed to disclose that: (1) the Company's primary contractor for the V.C. Summer Nuclear Station construction project, Westinghouse, lacked a legitimate construction schedule; (2) Westinghouse's reactor design was often not constructible; (3) Westinghouse lacked the organization needed to complete the V.C. Summer Nuclear Station construction project; and (4) as a result, the Company's public statements were materially false and misleading at all relevant times.

11

29. On September 4, 2017, the *Post and Courier* reported that an audit report completed in February 2016 provided evidence that the Company and Santee Cooper knew of significant flaws with their primary contractor Westinghouse, stating in part:

> Audit highlighted problems with South Carolina nuclear project a year before cancellation
>
> By Andrew Brown abrown@postandcourier.com and Andy Shain ashain@postandcourier.com Sep 4, 2017
>
> COLUMBIA — A newly released audit shows SCANA and Santee Cooper knew the effort to construct two nuclear reactors in Fairfield County was failing more than a year before the ambitious energy project was scrapped this July.
>
> ***The audit conducted by Bechtel, the country's largest construction and civil engineering firm, provides evidence that the partnering utilities knew of significant flaws with their primary contractor Westinghouse, but continued to tout the reactors being built at the V.C. Summer site and advocate for additional funding for a project already years behind schedule.***
>
> Bechtel completed its 130-page report in February 2016, three months before investor-owned SCANA asked state utility regulators to increase its share of the total project cost by more than $800 million and approve a fixed-price contract with now-bankrupt Westinghouse.
>
> All the while, SCANA officials told state regulatory staff members that they didn't have a physical copy of the report that they could share — a statement they contradicted under oath last month.
>
> \*   \*   \*
>
> ***The audit highlighted that Westinghouse lacked a legitimate construction schedule. It pointed out that the reactor design that was put together by Westinghouse was "often not constructible." And it suggested that Westinghouse lacked the organization needed to complete the project.***

(Emphasis added).

30. On this news, shares of the Company fell $0.29 from its previous closing price to close at $59.85 per share on September 5, 2017, further damaging investors.

12

31.     As a result of Defendants' wrongful acts and omissions, and the precipitous decline in the market value of the Company's securities, Plaintiff and other Class members have suffered significant losses and damages.

## PLAINTIFF'S CLASS ACTION ALLEGATIONS

32.     Plaintiff brings this action as a class action pursuant to Federal Rule of Civil Procedure 23(a) and (b)(3) on behalf of a Class, consisting of all those who purchased or otherwise acquired the publicly traded securities of SCANA during the Class Period (the "Class") and were damaged upon the revelation of the alleged corrective disclosure. Excluded from the Class are Defendants herein, the officers and directors of the Company, at all relevant times, members of their immediate families and their legal representatives, heirs, successors or assigns and any entity in which Defendants have or had a controlling interest.

33.     The members of the Class are so numerous that joinder of all members is impracticable. Throughout the Class Period, the Company's securities were actively traded on the NYSE. While the exact number of Class members is unknown to Plaintiff at this time and can be ascertained only through appropriate discovery, Plaintiff believes that there are hundreds or thousands of members in the proposed Class. Record owners and other members of the Class may be identified from records maintained by the Company or its transfer agent and may be notified of the pendency of this action by mail, using the form of notice similar to that customarily used in securities class actions.

34.     Plaintiff's claims are typical of the claims of the members of the Class as all members of the Class are similarly affected by Defendants' wrongful conduct in violation of federal law that is complained of herein.

35. Plaintiff will fairly and adequately protect the interests of the members of the Class and has retained counsel competent and experienced in class and securities litigation. Plaintiff has no interests antagonistic to or in conflict with those of the Class.

36. Common questions of law and fact exist as to all members of the Class and predominate over any questions solely affecting individual members of the Class. Among the questions of law and fact common to the Class are:

(a) whether Defendants' acts as alleged violated the federal securities laws;

(b) whether Defendants' statements to the investing public during the Class Period misrepresented material facts about the financial condition, business, operations, and management of the Company;

(c) whether Defendants' statements to the investing public during the Class Period omitted material facts necessary to make the statements made, in light of the circumstances under which they were made, not misleading;

(d) whether the Individual Defendants caused the Company to issue false and misleading SEC filings and public statements during the Class Period;

(e) whether Defendants acted knowingly or recklessly in issuing false and misleading SEC filings and public statements during the Class Period;

(f) whether the prices of the Company's securities during the Class Period were artificially inflated because of the Defendants' conduct complained of herein; and

(g) whether the members of the Class have sustained damages and, if so, what is the proper measure of damages.

37. A class action is superior to all other available methods for the fair and efficient adjudication of this controversy since joinder of all members is impracticable. Furthermore, as

the damages suffered by individual Class members may be relatively small, the expense and burden of individual litigation make it impossible for members of the Class to individually redress the wrongs done to them. There will be no difficulty in the management of this action as a class action.

38. Plaintiff will rely, in part, upon the presumption of reliance established by the fraud-on-the-market doctrine in that:

(a) Defendants made public misrepresentations or failed to disclose material facts during the Class Period;

(b) the omissions and misrepresentations were material;

(c) the Company's securities are traded in efficient markets;

(d) the Company's securities were liquid and traded with moderate to heavy volume during the Class Period;

(e) the Company traded on the NYSE, and was covered by multiple analysts;

(f) the misrepresentations and omissions alleged would tend to induce a reasonable investor to misjudge the value of the Company's securities; Plaintiff and members of the Class purchased and/or sold the Company's securities between the time the Defendants failed to disclose or misrepresented material facts and the time the true facts were disclosed, without knowledge of the omitted or misrepresented facts; and

(g) Unexpected material news about the Company was rapidly reflected in and incorporated into the Company's stock price during the Class Period.

39. Based upon the foregoing, Plaintiff and the members of the Class are entitled to a presumption of reliance upon the integrity of the market.

40. Alternatively, Plaintiff and the members of the Class are entitled to the presumption of reliance established by the Supreme Court in *Affiliated Ute Citizens of the State of Utah v. United States*, 406 U.S. 128, 92 S. Ct. 2430 (1972), as Defendants omitted material information in their Class Period statements in violation of a duty to disclose such information, as detailed above.

## COUNT I

### Violation of Section 10(b) of The Exchange Act and Rule 10b-5
### Against All Defendants

41. Plaintiff repeats and realleges each and every allegation contained above as if fully set forth herein.

42. This Count is asserted against the Company and the Individual Defendants and is based upon Section 10(b) of the Exchange Act, 15 U.S.C. § 78j(b), and Rule 10b-5 promulgated thereunder by the SEC.

43. During the Class Period, the Company and the Individual Defendants, individually and in concert, directly or indirectly, disseminated or approved the false statements specified above, which they knew or deliberately disregarded were misleading in that they contained misrepresentations and failed to disclose material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading.

44. The Company and the Individual Defendants violated §10(b) of the 1934 Act and Rule 10b-5 in that they: employed devices, schemes and artifices to defraud; made untrue statements of material facts or omitted to state material facts necessary in order to make the statements made, in light of the circumstances under which they were made, not misleading; and/or engaged in acts, practices and a course of business that operated as a fraud or deceit upon

plaintiff and others similarly situated in connection with their purchases of the Company's securities during the Class Period.

45. The Company and the Individual Defendants acted with scienter in that they knew that the public documents and statements issued or disseminated in the name of the Company were materially false and misleading; knew that such statements or documents would be issued or disseminated to the investing public; and knowingly and substantially participated, or acquiesced in the issuance or dissemination of such statements or documents as primary violations of the securities laws. These defendants by virtue of their receipt of information reflecting the true facts of the Company, their control over, and/or receipt and/or modification of the Company's allegedly materially misleading statements, and/or their associations with the Company which made them privy to confidential proprietary information concerning the Company, participated in the fraudulent scheme alleged herein.

46. Individual Defendants, who are the senior officers and/or directors of the Company, had actual knowledge of the material omissions and/or the falsity of the material statements set forth above, and intended to deceive Plaintiff and the other members of the Class, or, in the alternative, acted with reckless disregard for the truth when they failed to ascertain and disclose the true facts in the statements made by them or other personnel of the Company to members of the investing public, including Plaintiff and the Class.

47. As a result of the foregoing, the market price of the Company's securities was artificially inflated during the Class Period. In ignorance of the falsity of the Company's and the Individual Defendants' statements, Plaintiff and the other members of the Class relied on the statements described above and/or the integrity of the market price of the Company's securities during the Class Period in purchasing the Company's securities at prices that were artificially

inflated as a result of the Company's and the Individual Defendants' false and misleading statements.

48.     Had Plaintiff and the other members of the Class been aware that the market price of the Company's securities had been artificially and falsely inflated by the Company's and the Individual Defendants' misleading statements and by the material adverse information which the Company's and the Individual Defendants did not disclose, they would not have purchased the Company's securities at the artificially inflated prices that they did, or at all.

49.     As a result of the wrongful conduct alleged herein, Plaintiff and other members of the Class have suffered damages in an amount to be established at trial.

50.     By reason of the foregoing, the Company and the Individual Defendants have violated Section 10(b) of the 1934 Act and Rule 10b-5 promulgated thereunder and are liable to the Plaintiff and the other members of the Class for substantial damages which they suffered in connection with their purchases of the Company's securities during the Class Period.

## COUNT II

### Violation of Section 20(a) of The Exchange Act
### Against The Individual Defendants

51.     Plaintiff repeats and realleges each and every allegation contained in the foregoing paragraphs as if fully set forth herein.

52.     During the Class Period, the Individual Defendants participated in the operation and management of the Company, and conducted and participated, directly and indirectly, in the conduct of the Company's business affairs. Because of their senior positions, they knew the adverse non-public information regarding the Company's business practices.

53.     As officers and/or directors of a publicly owned company, the Individual Defendants had a duty to disseminate accurate and truthful information with respect to the

Company's financial condition and results of operations, and to correct promptly any public statements issued by the Company which had become materially false or misleading.

54. Because of their positions of control and authority as senior officers, the Individual Defendants were able to, and did, control the contents of the various reports, press releases and public filings which the Company disseminated in the marketplace during the Class Period. Throughout the Class Period, the Individual Defendants exercised their power and authority to cause the Company to engage in the wrongful acts complained of herein. The Individual Defendants therefore, were "controlling persons" of the Company within the meaning of Section 20(a) of the Exchange Act. In this capacity, they participated in the unlawful conduct alleged which artificially inflated the market price of the Company's securities.

55. Each of the Individual Defendants, therefore, acted as a controlling person of the Company. By reason of their senior management positions and/or being directors of the Company, each of the Individual Defendants had the power to direct the actions of, and exercised the same to cause, the Company to engage in the unlawful acts and conduct complained of herein. Each of the Individual Defendants exercised control over the general operations of the Company and possessed the power to control the specific activities which comprise the primary violations about which Plaintiff and the other members of the Class complain.

56. By reason of the above conduct, the Individual Defendants are liable pursuant to Section 20(a) of the Exchange Act for the violations committed by the Company.

**PRAYER FOR RELIEF**

WHEREFORE, Plaintiff demands judgment against Defendants as follows:

A. Determining that the instant action may be maintained as a class action under Rule 23 of the Federal Rules of Civil Procedure, and certifying Plaintiff as the Class representative;

B. Requiring Defendants to pay damages sustained by Plaintiff and the Class by reason of the acts and transactions alleged herein;

C. Awarding Plaintiff and the other members of the Class prejudgment and post-judgment interest, as well as their reasonable attorneys' fees, expert fees and other costs; and

D. Awarding such other and further relief as this Court may deem just and proper.

## DEMAND FOR TRIAL BY JURY

Plaintiff hereby demands a trial by jury.

Dated: October 5, 2017

Respectfully submitted,

/s/ Lance S. Boozer
Lance S. Boozer (Fed ID# 10418)

**THE BOOZER LAW FIRM, LLC**
1400 Laurel Street, Suite 4A
Columbia, SC 29201
Phone: (803) 608-5543
Fax: (803) 926-3463
Email: lsb@boozerlawfirm.com

*Liaison Counsel for Plaintiff*

**THE ROSEN LAW FIRM, P.A.**
Laurence M. Rosen, Esq.
Phillip Kim, Esq.
275 Madison Ave, 34th Floor
New York, NY 10016
Phone: (212) 686-1060
Fax: (212) 202-3827
Email: lrosen@rosenlegal.com
          pkim@rosenlegal.com

*Counsel for Plaintiff Subject to Pro Hac Vice*